UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIM. NO. |
| | : | |
| v. | : | |
| | : | |
| JOSEPH SARLO | : | |

## INFORMATION

The United States Attorney charges:

### COUNT ONE
(Conspiracy to Commit Bank Fraud – 18 U.S.C. § 1349)

### Relevant Persons and Entities

1. At all times relevant to this Information, the defendant, JOSEPH SARLO, was an owner and the Chief Executive Officer of New England Cash Dispensing Systems, Inc. ("NECDS").

2. At all times relevant to this Information, NECDS was headquartered in Branford, Connecticut, and in the business of operating a network of automated teller machines ("ATMs") throughout several states in the North East, including Connecticut, New York, Rhode Island, Massachusetts, New Hampshire, Vermont and Maine. NECDS operated the ATMs in the network under the label and branding of Domestic Bank. All of the ATMs in the network will be referred to collectively herein as "the NECDS network."

3. At all times relevant to this Information, Domestic Bank, the victim in this case, was an FDIC-insured bank located in Cranston, Rhode Island. During the course of the conspiracy described below, Domestic Bank supplied cash that was used to fill a large segment of the NECDS network.

4.   At various times relevant to this Information, Mount Vernon Money Center ("MVMC") was based in New York and, through its operating entities, engaged in various cash management businesses, including, among others, replenishing cash in ATMs and providing traditional armored transportation services.

5.   At all times relevant to this Information, the defendant had a number of co-conspirators who worked at NECDS, principally at its headquarters in Branford, Connecticut.

## The Conspiracy

6.   Beginning no later than 2007 and continuing through approximately February 2010, in the District of Connecticut and elsewhere, defendant JOSEPH SARLO and others, known and unknown to the United States Attorney, did combine, conspire, confederate and agree together and with each other to execute or attempt to execute a scheme and artifice to defraud Domestic Bank, a financial institution whose deposits were then insured by the Federal Deposit Insurance Corporation, and to obtain money and property owned by and under the custody and control of Domestic Bank by means of materially false and fraudulent pretenses, representations and promises, in violation of Title 18, United States Code, Section 1344.

## The Purpose of the Conspiracy

7.   The purpose of the conspiracy was for defendant JOSEPH SARLO and other co-conspirators to defraud Domestic Bank by converting cash supplied by Domestic Bank for use in certain ATMs in the NECDS network and using that cash for their own purposes. In particular, the cash was diverted to fund NECDS's operations, including to pay the salaries of the co-conspirators and other employees of NECDS and to expand NECDS's business. The purpose of

the conspiracy also was to cover up the fact that funds had been diverted so that Domestic Bank would continue to supply cash for the ATM network.

## Background of the NECDS ATM Network

8. Beginning in or about March 2000, NECDS and Domestic Bank entered into an agreement pursuant to which NECDS would supply ATM services in conjunction with Domestic Bank. The ATMs in the network were stand alone machines located in various commercial establishments, such as convenience stores and gas stations. NECDS was responsible for contracting with merchants and placing the ATMs in their establishments. NECDS also would perform maintenance on the ATMs. All of the ATMs in the NECDS network bore the logo of Domestic Bank. NECDS generated revenue as a result of interchange fees and surcharges on transactions conducted at the ATMs. At the outset, there were two sources of cash for the ATMs: (a) some were loaded with cash supplied by NECDS, and (b) others were loaded with cash supplied by the merchants in whose stores the ATMs were located.

9. In or about May 2002, Domestic Bank and NECDS entered into a so-called "Vault Cash Agreement" according to which Domestic Bank agreed to supply cash for specific ATMs in the network; the cash remained the exclusive property of Domestic Bank and would not be moved or removed from the ATMs by NECDS; and NECDS agreed to account for the cash, with Domestic Bank having the right to audit the funds.

10. As a result of the Vault Cash Agreement, beginning in May 2002 and continuing until approximately February 2010, there were three funding sources for ATMs within the NECDS network: (a) Domestic Bank provided the cash for specified ATMs in the network, (b) NECDS supplied cash for other ATMs in the network, and (c) certain merchants continued to

3

supply cash for yet other ATMs. Over the course of time, the number of ATMs in the network that were funded by Domestic Bank increased, while the number of ATMs funded by NECDS decreased.

11.     Although for a period MVMC delivered all of Domestic Bank's cash to the ATMs Domestic Bank funded, eventually, in or about May 2006, NECDS undertook the responsibility for loading a number of those ATMs with Domestic Bank's cash. MVMC continued to deliver cash to the other ATMs in the network that Domestic Bank funded.

12.     When NECDS first began delivering Domestic Bank's cash, in or about May 2006, it would pick up the cash from MVMC's premises in Bloomfield, Connecticut. Later, the practice changed and MVMC began delivering the cash directly to NECDS's headquarters in Branford, Connecticut. When NECDS received cash from MVMC, it was in sealed cash courier bags. Each sealed cash courier bag was labeled with the unique terminal identification number corresponding to particular ATM to be loaded.

13.     Between approximately May 2002 and approximately February 2010, the amount of money Domestic Bank supplied to the NECDS network varied, but averaged in the millions of dollars.

### The Manner and Means of the Conspiracy

14     It was part of the conspiracy that defendant JOSEPH SARLO and other co-conspirators agreed to and did order cash from Domestic Bank by falsely representing that it would be used in a Domestic-funded ATM, and then converted the cash for NECDS's own purposes. Specifically, the defendant and other co-conspirators caused false orders for cash to be submitted to Domestic Bank, and when that cash was received by NECDS, they caused the

4

sealed cash courier bags to be torn open, specific amounts of cash to be removed from those bags, typically in increments of $10,000, $6,000 or $4,000 per bag, and the cash to be used to re-fill ATMs that otherwise would have been loaded with NECDS's own funds.

15. It was further part of the conspiracy that defendant JOSEPH SARLO and other co-conspirators covered up the losses resulting from their conversion of Domestic Bank's cash by "floating" Domestic Bank's money, meaning the co-conspirators agreed to and did take Domestic Bank's cash that had been designated for one ATM and used it in other ATMs that had previously been shorted cash. As a result, over several years, Domestic Bank received a false accounting of its money.

16. In furtherance of the conspiracy, the defendant and others tracked the Domestic-funded ATMs that NECDS had shorted cash by creating so-called "Clubs." These "Clubs" included the "500 Club," or the "Fortune 500 Club," the "300 Club" and the "200 Club," each "Club" corresponding to the number of twenty-dollar bills that had been taken out of the sealed cash courier bag designated for a particular ATM and diverted to another ATM.

17. Between no later than 2007 and continuing through approximately February 2010, Domestic Bank lost approximately $4.8 million of the money it had supplied to the NECDS network.

### Overt Acts

18. In furtherance of the conspiracy and to effect the objects thereof, within the District of Connecticut and elsewhere, defendant JOSEPH SARLO and others did commit and cause to be committed the following overt acts, among others:

    a. On multiple occasions beginning no later than 2007 and continuing through

5

approximately February 2010, the defendant and his co-conspirators ordered and caused to ordered, and diverted and caused to be diverted, for use in other ATMs, including ATMs that NECDS otherwise would have had to supply its own cash to fill or other ATMs that Domestic Bank had agreed to fund, cash supplied by Domestic Bank for Domestic-funded ATMs. As a result, the defendant and his co-conspirators would and did either convert that cash to NECDS's own use or use the cash to create a false audit trail to be presented to Domestic Bank.

b.   On or about November 9, 2007, one of the defendant's co-conspirators ordered $24,000 from Domestic Bank to be added to an ATM at a gas station in Connecticut, knowing that only $14,000 of the money would be loaded into the ATM.

c.   On or about August 18, 2008, one of the defendant's co-conspirators sent an email message to another co-conspirator requesting that he order "10k extra" for approximately twelve ATMs funded by Domestic Bank that were on the so-called "500 Club."

d.   On or about August 6, 2009, one or more of the defendant's co-conspirators ordered a total of $890,000 from Domestic Bank to be loaded into specified ATMs, and thereafter instructed NECDS personnel to remove a total of approximately $184,000 from 46 sealed cash courier bags in equal increments of $4,000 from each bag.

All in violation of Title 18, United States Code, Section 1349.

_____
DEIRDRE M. DALY
ACTING UNITED STATES ATTORNEY

_____
PAUL A. MURPHY
ASSISTANT UNITED STATES ATTORNEY